IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

JASON SCOTT RIGNEY,               )
      Plaintiff,                      )       Civil Action No. 7:21cv00479
                                      )
v.                                )
                                      )       By:  Elizabeth K. Dillon
BETH E. CABELL, Warden,           )            United States District Judge
      Respondent.                     )

**MEMORANDUM OPINION**

Jason Scott Rigney, a Virginia inmate proceeding *pro se*, has filed a petition and an

amended petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging the

judgment entered against him by the Pittsylvania County Circuit Court on May 30, 2019.  The

respondent has filed a motion to dismiss, and Rigney has responded, making this matter ripe for

disposition.  For the reasons explained below, the court will grant the motion to dismiss.

I.   BACKGROUND

**A.  Factual Background**

In September 2018, Heather Bernard had recently ended a three-year relationship with

Jason Rigney.  Heather had previously been married to Nicholas Bernard, Rigney's half-brother.

Heather's affair with Rigney led to the end of her marriage.  Nicholas eventually forgave his ex-

wife, and they maintained a cordial relationship as co-parents of their three children.  At trial, he

admitted that he hated Rigney for breaking up his marriage.  The remainder of the evidence in

this trial is well summarized by the circuit court's habeas opinion:

> On Wednesday, September 19, 2018, Heather asked Nicholas to
> come to her house because she was scared.  She told him that Rigney
> had said that "he was going to run the truck through the house."  She
> asked Nicholas what they would do if Rigney came in the house; she
> feared that Rigney would come to her house "and that he's going to

kill us."  Nicholas told her that Rigney would have to go through him first.  Rigney did not come to the house that night.

Heather and her best friend, Loretta Mayhew, planned to spend time together on Saturday, September 22, 2018.  When Mayhew arrived at Heather's house, she saw Rigney's vehicle in the driveway.  When Mayhew entered the house, she saw Heather and Rigney; she left after she realized that she did not want to be a part of the conversation.  About fifteen minutes later, Heather came outside and sat on Mayhew's lap, crying.  Rigney also came out, tapped Heather on the shoulder, and "told her to have a nice life."  Later, Mayhew and Heather continued with their plans to go to Buffalo Wild Wings.

Afterward, Heather went home to get some clothes to stay the night at Mayhew's house.  Mayhew accompanied her.  When they arrived at the house, the only car Mayhew saw in the driveway was Heather's own car.  At the time, Heather was on the phone with Anthony Burton.  Heather had met Burton a few weeks earlier when she and Mayhew were at a restaurant, and Heather and he had "started dating."   At the time of the call, Burton was in Afghanistan.  Mayhew waited in her car as Heather went inside, but then Mayhew received a phone call from Burton, saying that Heather had screamed that Rigney was in the house.  Mayhew ran inside the house and saw Heather and Rigney.  Mayhew heard Rigney say, "Why did you fuck him?"  When Heather told Rigney that "because I like him and I want to give him a shot," Rigney "got mad and stormed off . . . and smacked the phone out of her hand."  Mayhew then saw Rigney's truck come into the victim's front yard where "he tore up her front yard," driving "angrily." drove circles in the front yard, tearing up the ground.

Mayhew described Heather's demeanor at this point as "scared and crying."  Heather gathered her clothes, and she and Mayhew left for Mayhew's house, each in their own vehicles.  Heather arrived at Mayhew's house about ten minutes after Mayhew.  Heather was on the phone with Rigney when she walked into Ms. Mayhew's house.  After the call ended, Heather told Mayhew that she was going to talk to Rigney one last time.  Heather then asked Mayhew that if anything happened to her, to please watch over her children.  Heather then left Mayhew's house.

Mayhew got up at 5:30 a.m. on Sunday, September 23, 2018.  She tried to call Heather several times before going to work, but every call went to voice mail.  She continued to try to call and text Heather throughout the day, with no success.  After work, she picked up her son and drove to Heather's house at about 4:00 p.m.  When Mayhew

2

got no answer, she went home.  She explained that Heather didn't finish work until 7:00 p.m.  After she learned that Heather had not come to work, she then went back to Heather's house, arriving at about 6:00 p.m.

Mayhew forced the lock with a library card.  She found Heather lying on her back on the floor at the foot of her bed.   There was a towel under her head, "soaked in blood."  "I called the cops and I told them I found my best friend dead."

Nicholas had his and Heather's three children with him from Thursday through Sunday.  Nicholas took the children back to Heather's house about an hour and a half late on Sunday, September 23.  When he arrived at Heather's house, Nicholas was confronted with crime scene tape and then learned that she had died.  Because he knew that Heather was terrified of Rigney, Nicholas blurted out to the officer standing in front of him that he was going to kill Rigney, and Nicholas left to find Rigney.  Nicholas found Rigney at a hotel in Danville and told him that Heather was dead.  Rigney, without asking any details, volunteered that he "was at Angela's all day helping her move."

The police arrived shortly after Nicholas and separated Nicholas and Rigney.  The police asked Rigney about his whereabouts the night before and about the clothing he had been wearing.  Rigney said he had washed his clothes but the tennis shoes he was wearing were in the other room.  Police collected the tennis shoes and a pair of boots from Rigney.   Rigney also surrendered his mobile telephone.  Rigney repeated that when he left Heather's house, he went to Angela Zeidler's house and spent the night there.

Angela Zeidler testified that Rigney was not with her on Saturday, and he did not spend the night at her house.  Zeidler did sent [sic] a text message to Rigney at 10:05 p.m. on Saturday, asking "WYD now?" meaning "what are you doing now?"  Rigney replied, "I don't know sister, probably best to get myself in a world of shit."  He sent another text message to Zeidler, asking "if I need you to do you say I was at your house tonight."  Zeidler testified that it was not unusual for Rigney to ask her to lie about his whereabouts.  She agreed that in this case, however, "that when he asked you to lie and say that he was at your house, that you would not do that for him, that when the police showed up," that she "told the truth," and that he "wasn't with me where I was."

When police confronted Rigney with Zeidler's statements, he then said that he was with "another girl," but when asked who the other

3

girl was, Rigney changed his answer again to say that he was not with another girl but instead spent the night at the Hi and Dri storage because his car ran out of gas.

Roxanne Rigney, Rigney's sister, testified that she agreed to help Rigney stay out on bond on an unrelated charge.  He had given Heather's home as his home address for the bond that she had signed, but he could not stay there after it became a crime scene. She traveled from South Carolina to agree to the modification to his bond to allow him to stay at a hotel instead.  The went "riding around" for a while because Rigney "had just been in jail and you know, he just wanted to be out."  After discussing "a lot of different things," Heather's death came up.  She described that Rigney was acting "nauseated."  They stopped to buy beer and Rigney threw up as soon as he drank two.

Later, Rigney "said that he put the gun in a bag and threw that away at the, in the trash can" at the rest stop on Route 700.  As they were crossing the Dan River Bridge on the bypass, Rigney "said that this is where I threw the phone."   Police later recovered Heather's mobile telephone in the area Rigney described.  After they returned to Rigney's hotel room, he confessed "That he shot her."  Rigney described the shots he fired.  He said [sic] "that there was a hole in the wall and that was, he shot the first time, he missed."  Police did find such a hole in the wall.  Rigney then said [sic] "he shot her two more times and then at the end he said the only reason that he shot her in the head was 'cause he didn't want her to suffer no more."  He added that "she was asking him to call . . . for help," to "call somebody," and that "she almost got to her phone and that's the only reason he took it."  "He said that there wouldn't be nothing on his shoes because he said there's no, you can see that, he said there's no feet print, he said he never stepped outside of the door."

On cross-examination, Roxanne Rigney admitted to accusing Rigney of sexually assaulting her.  On redirect, she clarified that it occurred when she was "eight, nine, ten" years old, and that she never reported him for that, and that she never turned him in for anything before the murder.  She explained that she was reporting the murder "Because I think it's a little bit different taking somebody's life."  She testified that they "got through" the sexual assault, and that "A lot of messed up stuff happened when we were growing up," so that she could "just accept it and go on."  She could not accept the murder and let it go on "without telling anybody," [sic] even though she still loved her brother.  In closing, Rigney's trial counsel argued that the sexual assault history gave her a motive to lie about Rigney's confession.

4

The medical examiner identified three bullet wounds:  One entered just below the right eye and entered the brain, a second entered just above the left ear and entered her neck, and the third entered through the left chest wall and struck the third rib, the left lung, the liver, stomach, colon, kidney and was recovered from the iliac bone.  The medical examiner identified multiple other bruises and lacerations.  She testified that the head and chest wounds "definitely" would have been fatal and that the neck wound was "potentially" fatal.  A blood sample was taken for DNA analysis.

Forensic analysis of a [spot] of blood taken from Rigney's tennis shoes confirmed that the blood was not his, that the DNA extracted from the shoe sample was consistent with the known sample of Heather's blood, and that the "random probability" of selecting someone else with the same DNA profile was "one in greater than seven point two billion" or greater than "the world population."

*Rigney v. Cabell*, No. CL21000865, slip op. at 5–10 (Pittsylvania County Circuit Court, March 9, 2022).

## B.  Procedural Background

Prior to trial, counsel objected to the Commonwealth's introduction of Rigney's confession to police on September 26 and 27, 2018.  The Commonwealth agreed that the statements had been taken after Rigney had invoked his right to counsel, and the parties entered an agreed stipulation to suppress the confession, noting the caveat that the confession could be used in rebuttal if Rigney testified at trial and "the statements would otherwise be admissible." R.[1] at 75.  Rigney was tried by a jury in Pittsylvania County Circuit Court on March 11 and 12, 2019.  The jury convicted him of first degree murder and use of a firearm in the commission of murder.  The jury recommended a sentence of life for the murder and three years for use of a

---

[1]  All references to the criminal record in *Commonwealth v. Rigney*, Nos. CR18000752 and CR18000753, Pittsylvania County Circuit Court, will be abbreviated "R." with citation to the typewritten page numbers in the bottom right corner of each page.

firearm.  Following consideration of a presentence report and a sentencing hearing, the court imposed the sentence recommended by the jury.  The final Order was entered May 30, 2019.

Rigney appealed on the grounds that the trial court erred in allowing Nicholas to testify to the hearsay statements made by Heather on September 19, 2018.  On December 3, 2019, the Court of Appeals of Virginia denied Rigney's appeal.  Likewise, the Supreme Court of Virginia refused his appeal on July 28, 2020.

On or about June 24, 2021, Rigney filed a habeas petition in the Pittsylvania County Circuit Court, along with a motion to proceed *in forma pauperis*.  The court denied the motion and returned the habeas petition to him, telling him it must be accompanied by the filing fee. Rigney alleges that he filed the petition again on July 27, 2021, and a check from his inmate account was directed to the court and received one day later.  The court returned the paperwork, saying that the petition had to be filed simultaneously with the payment of the fee.  The Circuit Court later received the habeas petition and the fee together, along with an affidavit from Rigney dated August 12, 2021, explaining the back-and-forth efforts he had made to timely file the petition.  His state petition raised 13 claims of ineffective of assistance of trial counsel, two claims of ineffective assistance of appellate counsel, and challenged the constitutionality of Virginia's "two-tiered appeal system," in which ineffective assistance claims must be raised post-conviction, without an attorney.  On March 9, 2022, the state habeas court dismissed Rigney's petition as untimely under state law, but the court also denied Rigney's claims on the merits as an alternative holding.  His appeal to the Supreme Court of Virginia is still pending.

Rigney filed a timely § 2254 petition on July 20, 2021, in the Eastern District of Virginia, which was transferred to this court on September 15, 2021.  His initial petition raised the following issues:

(1) The Supreme Court of Virginia's refusal of his petition for appeal on the issue of inadmissible hearsay was an unreasonable application of federal law.

(2) Because of the inadmissible hearsay, the state court's findings were based on an unreasonable determination of the facts.

(3) Virginia's "bifurcated two-tier appeal scheme" is unconstitutional.

Less than 21 days after respondent filed a motion to dismiss, on January 27, 2022, Rigney mailed an amended § 2254 petition, along with a motion requesting leave to file the amended petition. Over the respondent's objection, the court granted leave to file the amended petition, noting that new claims do not relate back to the original date of filing for statute of limitations purposes. The amended petition contained the original three claims, plus the ineffective assistance of counsel (trial and appellate) claims raised in the state habeas proceeding, plus an additional claim of ineffective assistance of trial counsel and a claim of judicial bias. The specifics of the new claims in the amended petition follow:

(4) Counsel failed to challenge the warrantless seizure of Rigney's tennis shoes and the resulting DNA analysis of the blood spot on the shoe.

(5) Counsel failed to investigate department policy regarding handling of the evidence and failed to point out to the jury that the shoes were not properly bagged before being placed in the officer's vehicle.

(6) Counsel failed to adequately investigate the possession, use, and ownership of the tennis shoes.

(7) Counsel failed to secure an independent DNA expert to explain contamination of blood evidence.

(8) Counsel failed to allow Rigney to participate meaningfully in his own defense by depriving him of the right to testify.

(9) Counsel did not spend adequate time preparing for trial or consulting with defendant.

(10) Counsel failed to make adequate judgments about objecting to statements because he was insufficiently familiar with the facts and documents in the case.

(11) Counsel failed to pursue an adequate investigation of potentially exculpatory evidence and witnesses (especially pertaining to 4 and 5 above).

(12) Counsel failed to interview relevant witnesses and law enforcement officers.

(13) Counsel failed to make an adequate judgment in the terms of the agreement to suppress Rigney's confession to police as long as he did not testify.

(14) Counsel failed to investigate potentially viable alibi defense.

(15) Counsel failed to investigate and introduce evidence of police duress compelling his sister Roxanne to testify against him.

(16) Counsel failed to subject the commonwealth's case to meaningful adversarial testing.

(17) Appellate counsel failed to raise any of the ineffective assistance of trial counsel issues on direct appeal.

(18) Appellate counsel failed to investigate and raise any other issues that could have been raised in a timely fashion.

(19) Trial Counsel entered a stipulation, without Rigney's consent, that effectively waived his right to testify and to present a defense.

(20) The trial court showed bias against Rigney by allowing counsel to enter agreement that effectively precluded his right to testify.

8

## II.  DISCUSSION

### A.  Standard of Review and Limitations on Federal Habeas

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a petitioner has a one-year period in which to file a federal habeas corpus petition.  This statute of limitations runs from the latest of:

> (A) The date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) The date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) The date on which the constitutional right asserted was initially recognized by the Supreme Court, if right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) The date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).  Further, the statute of limitations is tolled during the time in which "a *properly filed* application for State post-conviction or other collateral review . . . is pending."  28 U.S.C. § 2244(d)(2) (emphasis added).

A federal court may grant a petitioner habeas relief from a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Federal courts reviewing constitutional claims adjudicated on the merits in state court may grant relief on such a claim only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).

A federal district court reviewing a § 2254 petition is also limited by the separate but related doctrines of exhaustion, procedural default, and independent and adequate state law grounds.  The statute of limitations, standard of review, and these procedural doctrines promote the principles of finality, comity, and federalism, recognizing a state's legitimate interests in enforcing its laws, preventing disruption of state judicial proceedings, and allowing states the first opportunity to address and correct alleged violations of a state prisoner's federal rights. *Coleman v. Thompson*, 501 U.S. 722, 730–31 (1991).

When reviewing a state court's assessment of an ineffective assistance of counsel claim, federal review is "doubly deferential," because the deferential standard of review under the federal habeas statute overlaps with the deferential standard under *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011).  In other words, the federal court is to afford "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013).

## B.  Timeliness

Rigney's initial § 2254 petition is timely, but that petition raised only three issues.  The remaining issues were added in his amended petition, considered filed when he placed the amended petition and motion for leave in the institutional mail system on January 27, 2022. Claims filed in amended petition do not relate back to the date of initial filing unless they arise from the same core operative facts in both time and type as the timely filed claim or claims.

*Mayle v. Felix*, 545 U.S. 644, 662–64 (2005); *Gray v. Branker*, 529 F.3d 220, 241 (4th Cir. 2008).

None of the new claims in the amended petition arise from the same core operative facts as the claims in the original petition. Rigney's first two claims involve his contention that rejection of his hearsay argument was contrary to established federal law and that consideration of the hearsay evidence resulted in an unreasonable determination of the facts. The evidence at issue is Nicholas' testimony about statements made by Heather on the Wednesday before her death the following weekend. The error alleged is the court's ruling that the evidence was permissible. Rigney's third claim challenges the constitutionality of Virginia's laws requiring ineffective assistance of counsel claims to be raised in post-conviction proceedings rather than on direct appeal. The new claims in the amended petition are entirely different. Except for one, the new claims allege ineffective assistance of counsel. These claims do not challenge a decision of the court, a law of the legislature, or rules of court; they challenge the conduct of trial counsel and appellate counsel. Further, the acts alleged in support of each claim differ from one another and from the facts supporting the earlier claims. Claims regarding failure to interview officers and other witnesses arise from different facts than claims alleging insufficient time meeting with the client, which are different from failing to object to certain evidence at trial. None of the new claims are related to the trial court's admission of alleged hearsay testimony. Because the claims do not arise from the same core operative facts, they must have been timely as of January 27, 2022, or they are beyond the federal statute of limitations.

The Supreme Court of Virginia denied Rigney's petition for appeal on July 28, 2020. If Rigney had decided to petition the United States Supreme Court for further review, his petition for certiorari would be due no later than 90 days after the July 28, 2020 decision. That date was

October 26, 2020.  Because Rigney did not seek direct review in the United States Supreme Court, his judgment of conviction became final on October 26, 2020, and the one-year statute of limitations started running on that date.  The federal statute of limitations expired on October 26, 2021, unless some other provision of law extends or excused the limitation.

An application for state post-conviction relief is properly filed when "its delivery and acceptance are in compliance with the applicable laws and rules governing filings."  *Artuz v. Bennett*, 531 U.S. 4, 8 (2000).  Under Virginia law, to be properly filed, a state habeas petition must be timely and must be accompanied by full payment of the filing fee, unless the petitioner has been granted *in forma pauperis* status.  *Lahey v. Johnson*, 720 S.E.2d 534, 537 (Va. 2012). The state statute of limitations, which is different from the federal statute, is the later of: (1) two years from the date of judgment in the trial court or (2) one year from the final disposition of the direct appeal in state court or from the date on which the time to appeal has expired.  Va. Code § 8.01-654(A)(2).  The final judgment in the trial court was May 30, 2019; two years after that date was May 30, 2021.  The final disposition of the direct appeal in state court was July 28, 2020; one year from that date was July 28, 2021.  The state habeas court[2] concluded that the petition and filing fee could not have been placed in the institutional mail for filing before August 12, 2021, after the statute of limitations had expired.  *Rigney*, No. CL21000865 at 11.  It is not the province of the federal court to second-guess state law regarding state procedural requirements. *Sharpe v. Bell*, 593 F.3d 372, 377 (4th Cir. 2010).  If the state has determined that the matter was

---

[2]  The state habeas case is currently pending review in the Supreme Court of Virginia.  This means that the new claims are not yet exhausted.  The typical procedure when all or some of the claims in a federal petition are unexhausted, with state proceedings still available, is to dismiss the federal petition without prejudice; alternatively, in limited circumstances, the court has discretion to stay the federal action until the conclusion of state proceedings. *Rhines v. Weber*, 544 U.S. 269, 275–77 (2005).  This is because federal habeas relief "shall not be granted unless" the applicant has exhausted available state remedies.  28 U.S.C. § 2254(b)(1)(A).  The requirement to dismiss petitions that have not been exhausted does not apply if the federal court is denying the petition on the merits.  28 U.S.C. § 2254(b)(2).  Because Rigney's claims are without merit, denying the claims now is a better use of judicial resources.

12

not timely filed under state law, "that is the end of the matter for purposes of § 2244(d)(2)." *Pace v. DiGuglielmo*, 544 U.S. 408, 414 (2005).  Because his state petition was untimely, the state petition did not toll the statute of limitations.  The new claims added on January 27, 2022, are well past the filing deadline of October 26, 2001.

The Supreme Court has recognized that the statute of limitations set forth for habeas petitions under the AEDPA is subject to equitable tolling.  *Holland v. Florida*, 560 U.S. 631, 636 (2010).  A petitioner must show (1) that he has been pursuing his rights diligently and (2) that some extraordinary circumstances prevented his timely filing.  *Id.* at 649.  It appears that Rigney has pursued his rights diligently, timely filing a motion to proceed *in forma pauperis* in the circuit court and lodging his petition timely.  Requiring the filing fee and the petition to arrive on the same date, and therefore returning the petition, and then the filing fee, stating that they must be received together, seems like the elevation of form over substance.  The court notes also that Rigney filed his initial federal petition within the one year time frame, as well, an extra effort to pursue his rights diligently.  The court will address Rigney's untimely claims on the merits, assuming without deciding that he has established sufficient grounds for equitable tolling.

**C. Exhaustion**

At the time Rigney filed his claim on the form provided by the court clerk for the Eastern District of Virginia, August 19, 2021, Rigney stated that he had attempted to file his state habeas petition, but that the state court was "obstructing" his efforts to do so.  Pet. at 3, Dkt. No. 10.  However, most of the issues he originally raised had been raised on his direct appeal, so they were properly exhausted.  In his amended petition, Rigney raised claims primarily based on ineffective assistance of counsel, which cannot be raised on direct appeal in Virginia.  *See Lenz v. Commonwealth*, 544 S.E.2d 299, 304 (Va. 2001).  Rigney continued to assert that the state

court had impaired his ability to pursue a state habeas claim.  Because the time for filing a timely

state habeas case had passed, the court reasoned that Rigney's new habeas issues would be

deemed simultaneously exhausted and defaulted, as they had not been presented to the highest

state court and would now be procedurally barred.  *See Bassette v. Thompson*, 915 F.2d 932,

936–37 (4th Cir. 1990).

The respondent's motion to dismiss alerted the court to the fact that Rigney had a

pending state habeas petition in Pittsylvania County Circuit Court.  As indicated in footnote 2

previously, federal habeas petitions filed when the state proceedings are still pending must

ordinarily be dismissed without prejudice, even if some of the issues have been fully exhausted

on direct appeal.   However, the federal habeas statute of limitations is not tolled by a previously

filed federal habeas petition, even though dismissed without prejudice.  *Duncan v. Walker*, 533

U.S. 167, 181–82 (2001).  Had the court done this, Rigney may have been time-barred on all

issues raised in his case when he re-filed his petition, if the Supreme Court of Virginia agrees

with the Circuit Court that the state petition was not properly filed.

Section 2254(b)(2) allows the court to dismiss unexhausted petitions on the merits, and

the unexhausted issues of ineffective assistance of counsel have no merit, as will be discussed

more fully below.

## D.  Analysis of Issues

### 1.  State court decision on hearsay (claims 1 and 2)

Rigney's first two claims are that the Supreme Court of Virginia's refusal of his petition

for appeal concerning inadmissible hearsay was contrary to clearly established federal law and

resulted in an unreasonable determination of facts.  As worded, his complaint suggests that

federal law required the state supreme court to hear his appeal.  That claim is erroneous.

14

Although all persons who disagree with the final decision of the Court of Appeals may petition the Supreme Court of Virginia for appeal, whether to accept the appeal is within the discretion of the Supreme Court.  Va. Code § 17.1-411.  The United States Supreme Court has held that appellate review as a matter of right is not required by due process.  *Griffin v. Illinois*, 351 U.S. 12, 18 (1956).  Virginia's system of discretionary appellate review by the Supreme Court of Virginia does not violate due process.  *Saunders v. Reynolds*, 204 S.E.2d 421, 423 (Va. 1974).

The court presumes that Rigney's actual claim is the same as he raised in his direct appeal, namely that admission of Nicholas Bernard's testimony about Heather's statements to him on September 19, 2018, violated the rule against hearsay and his constitutional right to confront his accusers.  A federal court may not grant relief unless the state court's decision was contrary to, or an unreasonable application of, federal law, as determined by the United States Supreme Court, or was based upon an unreasonable determination of the facts.  Where, as here, the issue was presented to the state's highest court on the merits, but the court declined to hear the case, the federal habeas court "looks through" the Supreme Court of Virginia's refusal of the appeal and reviews the reasoning of the court of appeals.  *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) (holding that federal habeas court must presume that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground").  Accordingly, this court reviews the reasoning of the court of appeals for reasonableness.

The state court of appeals addressed the issue under standard hearsay rules, not Confrontation Clause precedent.  This was appropriate because the victim's statements were not testimonial in purpose.  She made the statements to her ex-husband to explain why she was afraid and wanted him to stay with her, not to police officers interrogating her about a crime.  A

statement does not fall within the Confrontation Clause unless its primary purpose when made was testimonial. *Ohio v. Clark*, 576 U.S. 237, 245 (2015). When there is no primary testimonial purpose, the admissibility of a statement is based upon the state's rules of evidence, not the Confrontation Clause. *Michigan v. Bryant*, 562 U.S. 344, 359 (2011). Because the victim's statements to her ex-husband were not testimonial when made, the state court's decision remains a state law evidence question, not a federal question. The state court's consideration of the issue as a state evidence law question was both reasonable and correct. As for the substance of the state court's decision on the hearsay exception, state law questions are not cognizable in federal habeas proceedings. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).

As for the appellate court's determination of the facts, the issue is not whether the facts were sufficient to support his conviction without the hearsay evidence (although they were), the issue is whether the court reasonably based its decision on facts supporting the conclusion that the victim's statements were an expression of her state of mind at the time she made them. Nicholas' testimony that she asked him to come over because she was afraid, followed by the statements explaining her fear, support the reasonableness of the court's factual determination. Not a scintilla of evidence suggests that she made the statements intending them to be used in a criminal trial after her future death.

Because the state court decision that the statements were admissible was a non-cognizable state law issue, not a Confrontation Clause issue, was a reasonable application of federal law based upon a reasonable determination of the facts, the court must deny Claims 1 and 2 in Rigney's petition.

16

2.  **Constitutionality of limiting ineffective assistance of counsel claims to post-conviction proceedings (claim 3)**

Although Rigney's state habeas claim on this issue is still pending in the Supreme Court of Virginia, the habeas trial court noted that the issue was one that should have been raised on direct appeal in state court, not in a later habeas petition.  In other words, the issue was already procedurally defaulted.  *See Slayton v. Parrigan*, 205 S.E.2d 680, 682 (1974) (holding that habeas cannot be used as a substitute for appeal).  Failure to raise issues on direct appeal, as required by *Slayton*, has been recognized as an independent and adequate state ground for procedural default.  *Mu'Min v. Pruett*, 125 F.3d 192, 194 (4th Cir. 1997).  When a petitioner's claim has been defaulted under an independent and adequate state rule, a federal court can only grant relief if the petitioner can show cause for default and actual prejudice from the claimed federal violation.  *Coleman*, 501 U.S. at 750.

Cause for procedural default requires the existence of some objective factor, external to the defense and not attributable to the prisoner.  *Id.* at 756–57.  Examples of good cause for default include interference by government officials that makes compliance impossible or impractical, such as failing to provide transcripts, coercion, or acts or omissions of prison officials.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  Negligence or inadvertence of state trial counsel or appellate counsel, however, is generally not adequate cause for default unless it rises to the level of constitutionally ineffective assistance of counsel.  *Id.* at 486.  The court need not address whether Rigney has cause for default, because he cannot prove the other required prong, prejudice from the violation.

To show prejudice necessary to overcome procedural default, the petitioner must show that the error worked to his "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *United States v. Frady*, 456 U.S. 152, 170 (1982).  Rigney

cannot make this showing because (1) the issue has no effect on the outcome of the trial and (2) the issue lacks merit. Rigney characterizes Virginia's procedure as a "bifurcated two-tier appeal" process, which is inaccurate. An appeal is the opportunity to ask a higher court to review the record of the trial proceedings and consider whether identified legal and evidentiary decisions made by the trial court were wrongly decided. A petition for a writ of habeas corpus is a separate lawsuit, challenging the power and authority of the trial court to order a petitioner's continued detention. *Elliott v. Warden*, 652 S.E.2d 465, 487 (Va. 2007). Habeas corpus is not to be used to circumvent the normal appellate process. *Slayton*, 205 S.E.2d at 682. Nor can matters that properly belong in a habeas petition, such as ineffective assistance of counsel, be raised on direct appeal. Ineffective assistance of counsel claims often cannot be decided based on the trial record, and additional evidence is needed to develop the factual basis for a claim. *Martinez v. Ryan*, 566 U.S. 1, 13 (2012). Appellate courts in Virginia do not typically conduct such evidentiary hearings, nor should they. The *Martinez* Court expressly noted the propriety of states choosing to save ineffective assistance claims for a collateral proceeding. *Id.*

Rigney's argument is that treating ineffective assistance of counsel claims differently deprives an indigent defendant of appointed counsel to assist in developing his claims, whereas defendants have the benefit of appointed counsel on appeal. That does not render the separate proceedings unconstitutional, however, because the Court has held that a habeas petitioner is not constitutionally entitled to counsel in state habeas proceedings, no matter what issues are raised. *Coleman*, 501 U.S. at 752.

Because the statute is not unconstitutional, Rigney cannot prove any prejudice caused by failure to raise the claim earlier, and the claim is procedurally defaulted and dismissed.

### 3. Ineffective assistance of counsel

As previously noted, Rigney's claims of ineffective assistance of counsel are still pending on appeal of his state habeas petition and are technically not exhausted.  However, the circuit court, while holding the state petition untimely, ruled on the merits of Rigney's habeas claims as an alternate ground for its decision.  Even though the merits decisions were alternate grounds, they are still claims "adjudicated on the merits in State court proceedings" within the meaning of § 2254(d).  *Brooks v. Bagley*, 513 F.3d 618, 624 (6th Cir. 2008).  Therefore, this court cannot find Rigney's claims meritorious unless the state court's decision was an unreasonable application of federal law or based on an unreasonable determination of the facts.

The state court correctly identified the standard that applies for reviewing constitutional claims for ineffective assistance of counsel.  The Supreme Court has directed a highly deferential standard for review of counsel's performance.  A petitioner must show that (1) counsel's performance was so deficient that he was not functioning as counsel guaranteed by the Sixth Amendment *and* (2) that the deficient performance prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Deficient performance requires a showing that counsel's performance fell below "an objective standard of reasonableness . . . under prevailing professional norms."  *Id.* at 688.  The reviewing court must not rely upon "the distorting effects of hindsight," but must presume that counsel's decisions were made in the exercise of reasonable judgment and fell within the range of reasonable strategy decisions.  *Id.* at 689–90.  To establish prejudice, the petitioner must show that there was "a reasonable probability that the outcome of the proceedings would have been different," which means "a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.

The state circuit court held that Rigney failed to prove either deficient performance or prejudice on his claims. The question now is not whether this court "believes the state court's determination under the *Strickland* standard was incorrect, but whether that determination was unreasonable—a substantially higher threshold." *Knowles v. Mirazavance*, 556 U.S. 111, 123 (2009). "If this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). This court will now address the merits of these claims.

   a.   *The tennis shoes (claims 4, 5, and 6)*

Rigney first asserts that counsel was ineffective in failing to file a motion to suppress the tennis shoes and the subsequent DNA analysis of the blood on the shoes because the shoes were seized without a warrant. Rigney adds in his federal petition that he was too intoxicated to consent to the seizure. In an affidavit filed with the court, trial counsel felt that the shoes were within the scope of the warrant, and if they were seized before the warrant, they would have been admissible under the inevitable discovery doctrine. Further, he noted his fear that Rigney would have to claim ownership of the shoes to have standing to contest their seizure.[3]

Under the inevitable discovery doctrine, if the prosecution can establish by a preponderance of the evidence (more likely than not) that the evidence would inevitably have been discovered by lawful means, then the deterrence rationale behind the exclusionary rule has so little basis that the evidence should be admitted. Otherwise, the police are placed in a worse position than they would have been had the misconduct never occurred, rather than being returned to the status quo. *Nix v. Williams*, 467 U.S. 431, 444 (1984). The state habeas court accepted counsel's position that the shoes could not successfully be excluded from evidence.

---

[3] As Rigney points out, counsel was incorrect on this point. The Supreme Court has held that testimony given by a defendant in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not be admitted against him at trial on the issue of guilt. *Simmons v. United States*, 390 U.S. 377, 394 (1968). However, the habeas court's decision was based on futility of the motion, not standing issues.

Counsel is not deficient for failing to file a futile motion. *Moody v. Polk*, 408 F.3d 141, 151 (4th Cir. 2005). The court cannot say that the state court's decision was an unreasonable application of the law.

Rigney also alleges that the police mishandled the tennis shoes by not bagging them before putting them in the police car and that counsel failed to investigate the policies of the law enforcement agencies so that he could demonstrate possible contamination of the evidence. The state court noted that Rigney failed to produce evidence of what the policies were or should have been, and therefore he could not prove deficiency or prejudice. The state court reasonably applied the law. A petitioner cannot state a valid claim for ineffective assistance of counsel if he does not allege what the investigation would have revealed. *Bassette v. Thompson*, 915 F.2d 932, 940–41 (4th Cir. 1990). Additionally, this court notes that Rigney's allegation is contradicted by the record. Investigator Jim Davis testified that he took the tennis shoes off Rigney's feet at the motel, placed them temporarily in the floor, and then *put them in a brown paper bag* inside Rigney's vehicle, which was being towed; he removed the bag from the car after it arrived at the impound lot and took the shoes to Investigator Brumfield at the crime scene. R. at 542–545.

Finally, Rigney alleges that counsel failed to adequately investigate the possession, use, and ownership of the tennis shoes. Rigney states that he told counsel that there was a lot of traffic in and out of his motel room and that the victim often wore those shoes. However, Rigney does not identify what evidence or witness counsel would have found if he had investigated. This is fatal to his claim. *Bassette*, 915 F.2d at 940–41. The victim obviously could not testify that she wore the shoes. Counsel explained in his affidavit that calling Rigney to testify that others had access to the shoes would open the door to admission of Rigney's suppressed

confession to law enforcement, and the benefit of this would not outweigh the harm to the defense. Because Rigney has not identified any other evidence or witness testimony that counsel would have discovered, his ineffective assistance claim fails, as the state court reasonably held.

Because the state court's decision on each of these claims was based on a reasonable determination of the facts and application of federal law, this court cannot grant relief. Accordingly, claims 4, 5, and 6 will be dismissed.

### b. *DNA expert (claim 7)*

Rigney asserts that counsel was ineffective because he failed to secure an independent DNA expert to explain contamination of blood evidence. However, as the state court noted, he did not offer any evidence of what an independent expert would have testified about. Again, this was fatal to his claim. *Id.* Counsel also made a reasonable strategy decision that challenging the accuracy of the DNA evidence would not be persuasive. There was nothing unusual about the lab results, and the blood was not a mix from more than one person, which would be the case if the evidence were contaminated, so there was little of value that an expert could offer. The court must presume that counsel's strategy decisions were reasonable. *Strickland*, 466 U.S. at 690. The state court's decision was a reasonable application of federal law, based upon a reasonable determination of the facts presented. This court will dismiss claim 7.

### c. *Inadequate consultation with the client (claim 9)*

Rigney alleges that trial counsel spent less than 50 minutes of pretrial preparation time with him and did not discuss trial strategy with him. Counsel's affidavit asserted that he spent well over 50 minutes with Rigney, and that he discussed the following strategy issues with him: the difficulty caused by the existence of the confession, even though it was suppressed; the inability to put Rigney on the stand; and the possibility of using voluntary intoxication as a

defense to premeditation, in which Rigney was not interested.  The state court accepted counsel's explanation that he had advised Rigney of strategic approaches to trial.  The court's finding of facts is supported by counsel's affidavit, and thus, it is a reasonable determination of fact.

The state court also noted that there is "no established minimum number of meetings between counsel and client prior to trial necessary to prepare an attorney to provide effective assistance of counsel."  *Moody*, 408 F.3d at 148 (internal quotation omitted).  Further, an allegation that counsel spent little time with the defendant is not enough to establish ineffective assistance of counsel without evidence of prejudice or other defects in performance.  *Lenz v. Washington*, 444 F.3d 295, 303 (4th Cir. 2006).  The state court's application of law was reasonable, and this court cannot grant relief on this claim.

### d.  Inadequate preparation for trial (claims 9, 11, 12, 14, 15, and 18)

Rigney alleges numerous claims of inadequate preparation for trial and failure to investigate:  did not spend adequate time preparing for trial, failed to adequately investigate potentially exculpatory evidence and witnesses, failed to interview relevant witnesses and law enforcement officers, failed to investigate potentially viable alibi defense, failed to investigate evidence of police duress to make his sister Roxanne testify against him, and failed to investigate and raise any other issues that could have been raised.  The state habeas court noted that the allegations were conclusory and did not create a basis for habeas relief.  That decision was factually and legally reasonable.

Nowhere does Rigney state how much time counsel spent preparing compared to how much time he should have spent.  Nor could he reasonably have any idea how much work is necessary for counsel to prepare for trial.

In his § 2254 petition, Rigney states that the exculpatory evidence not investigated was the handling of the tennis shoes issues. For the reasons stated in subsection *a.* above, this claim is without merit. He also claims that the witnesses not interviewed were those with information relevant to seizure of the tennis shoes, evidence handling procedures, and others who had access to the shoes. Again, for the reasons stated in subsection *a.* above, this claim is without merit.

Rigney alleges that records would support his viable alibi defense, but he does not identify what records those might be, which is fatal to his claim. *Bassette*, 915 F.2d at 940–41. Further, Rigney fails to comprehend the problems that would be raised by his testimony in support of an alibi defense. As will be discussed in the next subsection, Rigney's confession created the problems that limited his ability to testify, not his attorney. Further, Rigney does not appreciate how little value his alibi defense would have, given the text messages that were retrieved from his phone, even though he had "deleted" them from his active window.

Rigney alleges that his sister told unidentified family and friends that the prosecutor and police were pressuring her to testify "to a version of events not necessarily consistent with the truth or facts" and threatened to charge her with obstruction of justice or accessory after the fact if she pled the Fifth Amendment at trial. Counsel investigated the police records and found no evidence there of any improper behavior. Advising a person that she is subject to criminal charges is not duress. *See Barkley v. Commonwealth*, 576 S.E.2d 234, 242 (Va. 2003) (holding that officers advising defendant that they could obtain a search warrant was not coercion to consent; it was advising him of his options). Rigney has not identified what witnesses would support the claimed duress, bearing in mind that testimony that "Roxanne told me that the police told her . . ." would be inadmissible hearsay to prove duress. Finally, counsel rigorously cross-examined Roxanne, and she remained firm in her testimony. The state court reasonably

determined that Rigney failed to plead sufficient facts to show either deficient performance or prejudice.

Finally, the allegation that counsel failed to investigate and raise any other issues that could have been raised completely fails to allege facts supporting deficient performance or prejudice.  At a minimum, to get past this stage of the process, Rigney would need to identify what issues would have been discovered and what facts support those issues, as well as how those issues would have affected the outcome of the trial.

For all the reasons discussed above, the state court's determination that Rigney failed to establish deficient performance or prejudice was reasonable.  This court will dismiss claims 9, 11, 12, 14, 15, and 18.

> ### e. *Rigney's right to testify (claims 8, 10, 13, 19, and 20)*

Rigney claims that counsel deprived him of his right to participate meaningfully in his defense by depriving him of the right to testify (claim 8).  To Rigney's understanding, counsel deprived him of his right to testify by using inadequate judgment (claim 10) to enter an agreement, without Rigney's consent, to waive his right to testify (claims 11 and 19).[4]  Rigney fails to understand that the law allows the prosecutor to use a suppressed confession to impeach a testifying defendant when the sole reason for suppression is that the defendant's *Miranda*[5] rights have been violated.  Rigney had asserted his right to remain silent and consult an attorney.

---

[4] Respondent asserts that claims 19 and 20 have never been presented to the state court.  To the court, 19 appears to be the same as 11, just in different words, and 11 was presented in the circuit court habeas petition. Claim 20, that the court showed bias against Rigney by entering an agreement with counsel depriving him of his right to testify, without consent, was not raised in the state habeas, only in a motion to recuse the judge.  For habeas purposes, the issue is simultaneously exhausted and defaulted, because it cannot now be raised in state court. Because the issue is intertwined with the other claims in this subsection, and is without merit, the court will address it notwithstanding the procedural default.

[5] In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court announced a rule requiring officers to advise suspects of their right to remain silent and right to have an attorney before conducting custodial interrogation. If the defendant invokes his right to an attorney, interrogation must stop until an attorney is present. *Id.* at 474.

Thereafter, investigators advised Rigney what his sister had told them, thereby eliciting Rigney's confession, in violation of *Miranda*.

Rigney states he believed that the confession was going to be suppressed as involuntary because he was intoxicated. However, statements made during custodial interrogation are not automatically inadmissible or involuntary just because the defendant was intoxicated. *Boggs v. Commonwealth*, 331 S.E.2d 407, 415–16 (Va. 1985). To be inadmissible as involuntary, there must also be proof of improper police coercion to obtain the confession. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). There is no such evidence in the record. To complicate counsel's decision, not all confessions given after a defendant invokes *Miranda* and before he has consulted with an attorney are inadmissible. Such statements are inadmissible only if they are brought about by express questioning or its functional equivalent, that is, any words or actions on the part of the police that police should know are likely to elicit an incriminating response from the suspect. *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980). There was a real possibility that the trial court could decide that officers telling Rigney what his sister had said did not constitute interrogation, thereby rendering the confession admissible in the Commonwealth's case-in-chief. *See Commonwealth v. Quarles*, 720 S.E.2d 84, 88–89 (Va. 2012) (holding that officer's statement in response to suspect's assertion of rights, "that's fine. I'm not the person who robbed the white lady and hit her in the head with a brick," was not the functional equivalent of interrogation).

Counsel recognized the need to exclude Rigney's confession from evidence, and that the court could rule against him on both arguments. The Commonwealth Attorney recognized that Rigney's confession came after he had asserted his right to counsel before questioning. By entering the stipulation to suppress the confession for violation of *Miranda*, counsel ensured the

exclusion of the confession from evidence.  The likelihood of prevailing on involuntariness was low.  The stipulation to exclude the confession for *Miranda* violation was a strategic decision that counsel made, using reasonable judgment.  Given the options available, counsel's decision was very reasonable and more than adequate judgment.  Because his decision was reasonable, there was no deficient performance.

Nor can Rigney establish prejudice.  When a confession is otherwise voluntary, but made in violation of *Miranda*, the prosecution cannot use the confession *in its case in chief*, but it can be used to impeach the defendant on cross-examination if he testifies inconsistently with the statement.  *Oregon v. Elstad*, 470 U.S. 298, 307 (1985).  The Supreme Court has long recognized that it would be unconscionable to allow a defendant to "deny every fact disclosed . . . free from confrontation with his prior statements" in a prior voluntary but inadmissible confession.  *Id.* (citing *Harris v. New York*, 401 U.S. 222, 225 and n.2 (1971)).  Had there been no agreement, and if the court granted a motion to suppress, finding that his confession was the result of interrogation after invoking *Miranda*, the result would have been the same, as a matter of law: The prosecution could not use the confession in presenting its case, but if the defendant testified to different facts at trial, the prosecutor would be allowed to impeach him with the confession.

Counsel did not engage in a deceptive, underhanded manner to deprive Rigney of the right to testify.  Rather, counsel recognized the difficult position Rigney faced because he had given the confession.  Keeping the confession out of evidence was essential to any chance of a defense verdict, and the only way to make guarantee it stayed out was to stipulate to the *Miranda* violation and keep Rigney from testifying.  While perhaps confusing to a layperson, counsel's performance was not deficient in any way regarding this issue; counsel did exactly what any reasonable attorney would do.  The reason Rigney could not testify is because of the law

27

discussed above, not because of counsel's agreement.  Further, the judge did not exhibit any bias by endorsing the order suppressing the confession and acknowledging the legal limits of the suppression.

Counsel's affidavit asserts that he discussed this strategy with Rigney in advance.  The state habeas court accepted counsel's sworn assertions and found that Rigney failed to show deficient performance or prejudice.  That was a reasonable determination of facts and a reasonable application of federal law, which this court must accept.  For the sake of argument, even if counsel did not obtain Rigney's "consent," the stipulation entered by counsel was an agreement regarding the admission of evidence, which is a strategy decision reserved to the attorney, not the client.  *Gonzalez v. United States*, 553 U.S. 242, 248–49 (2008).  Tactical decisions of the attorney are binding on the client; the adversary system could not function effectively if every tactical decision required client approval.  *Id.* at 249.

Further, counsel did not prevent Rigney from testifying; rather, he explained the consequences of testifying and made a recommendation.  This was put on the record, including counsel's statement that "I have advised you that if you wish to testify, nobody including myself can stop you from testifying, right?"  R. at 846.  Rigney acknowledged that counsel had advised him whether he should or should not testify, that he had had enough time to think about the decision, and that it was his wish to remain silent.  *Id.* at 847.

Claims 8, 10, 13, 19, and 20 are completely without merit and will be dismissed.

> *f.  Failure to raise ineffectiveness of trial counsel on direct appeal (claim 17)*

As discussed previously in response to Claim 2, claims raising ineffective assistance of counsel are not cognizable on direct appeal.  *Lenz*, 544 S.E.2d at 304.  Therefore, counsel was not deficient for failing to raise the issue.  Counsel is not required to raise a futile or improper

issue on appeal.  *Moody*, 408 F.3d at 151.  Because the court of appeals would not consider ineffectiveness claims on direct appeal, there was no prejudice to Rigney from failing to raise them.  The state habeas court's conclusion on this issue was reasonable.  Claim 17 will be dismissed.

> g.  *Failure to subject the Commonwealth's case to "meaningful adversarial testing" (claim 16)*

In this claim, Rigney appears to re-argue the above issues as the way he believes counsel should have approached the case.  For the reasons already discussed, strategy matters are properly left to the attorney, who knows the rules of evidence and the law, which Rigney does not.  Counsel subjected the state's evidence to meaningful adversarial testing, as detailed in the state habeas opinion.  A federal habeas court may not disregard the reasonable factual findings of the state court.  Claim 16 will be dismissed.

### III. CONCLUSION

When issuing a final order adverse to a § 2254 petitioner, the court must issue or deny a certificate of appealability.  Fed. R. Gov. § 2254 Cases 11(a).  A certificate of appealability may only issue if the movant has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2).  The movant must show that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.  *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003); *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000).  In the context of a procedural ruling, the movant must demonstrate both that the dispositive procedural ruling is debatable and that the action states a debatable claim of the denial of a constitutional right.  Rigney has not made such showings in this case.

For the reasons stated above, the court will grant the respondent's motion to dismiss but with prejudice, will dismiss the petition for a writ of habeas corpus, and deny a certificate of appealability.

An appropriate order will be entered.

Entered: December 5, 2022.


*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge